## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DALE GROSS, et al.,                        )
                                           )
        Plaintiffs,        )
                                           )
v.                                         )    **Case No. 04-CV-0098-CVE-FHM**
                                           )
HALE-HALSELL COMPANY,                      )
an Oklahoma Corporation, and               )
SANDRA L. HAWK, personal representative    )
of Estate of Robert D. Hawk, deceased,     )
                                           )
        Defendants.        )


## OPINION AND ORDER

Now before the Court are the Motion to Strike Plaintiffs' Demand for a Jury Trial (Dkt. # 63) filed by defendant Hale-Halsell Company ("Hale-Halsell"), Defendant's Motion for Summary Judgment (Dkt. # 40) filed by Robert D. Hawk[1] ("Hawk"), and Defendant's Motion for Partial Summary Judgment (Dkt. # 64) filed by Hale-Halsell. Hale-Halsell moves to strike the demand for a jury trial of plaintiffs' claims under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101 et seq., and under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101, et seq. Plaintiffs argue that they have a Seventh Amendment right to a jury trial. They also argue that, given the existence of several claims in the action, the most efficient course of action is to try all issues before the jury. Hawk moves for summary judgment on the grounds that he was not a "fiduciary" of the Hale-Halsell Company Employee Benefit Plan (the

---

[1]    Robert D. Hawk, one of the original defendants, filed the Motion for Summary Judgment (Dkt. # 40). On June 29, 2006, Sandra L. Hawk filed a suggestion of death, reporting the death of Robert D. Hawk. On June 30, 2006, all plaintiffs filed a motion to substitute Sandra L. Hawk, personal representative of the Estate of Robert D. Hawk, deceased, for defendant Robert D. Hawk. On July 5, 2006, the Court ordered that Sandra L. Hawk be substituted for all purposes for defendant Robert D. Hawk.

"Plan"), as defined by ERISA.  Alternatively, Hawk argues that, even if he were a fiduciary, he did not breach any duty as specified in the Plan. Plaintiffs claim that Hawk was a fiduciary and that he breached his fiduciary duty to the employee-plaintiffs by failing to ensure the deposit of employee-plaintiffs' deductions in their Employee Benefit Claims Account ("Claims Account").  Hale-Halsell moves for partial summary judgment on plaintiffs' WARN Act and ERISA claims. Hale-Halsell asserts that it was not required to provide at least sixty (60) days' advance written notice of plant closing and mass layoff based on the "unforeseeable business circumstances" exception, 29 U.S.C. § 2102(b)(2)(A), and the "faltering company" exception, 29 U.S.C. § 2102(b)(1), of the WARN Act. With respect to ERISA, Hale-Halsell argues that it was not the party responsible for failing to deposit money into plaintiffs' Claims Account.

## I.

Prior to its closing and filing for bankruptcy relief in 2004,[2] Hale-Halsell operated a warehouse and distribution center in Tulsa, Oklahoma which supplied food and grocery items to independent grocers and stores in Oklahoma. Hawk was the Chief Executive Officer of Hale-Halsell. Plaintiffs were employees of Hale-Halsell.

Hale-Halsell adopted an employee benefits plan.[3]  The Plan was funded by contributions made by employee-participants and the general assets of Hale-Halsell. Under the Plan, money was withheld from the employees' paychecks and contributed on a weekly basis to the Claims Account

---

[2]     Despite the bankruptcy proceeding, the Bankruptcy Court modified the automatic stay as to Hale-Halsell to allow this action to proceed.  See Dkt. # 35.

[3]     Hale-Halsell adopted the original plan on January 1, 1980. This original plan was amended several times, including on January 1, 2003 and January 1, 2004. Also, on January 9, 2004, Hale-Halsell restated the plan, effective as of January 1, 2004. The January 9, 2004 employee benefits plan is referred to as the "Plan."

at the F&M Bank & Trust Company ("F&M"). Hawk was the signatory of the Claims Account. The Plan Administrator, Hale-Halsell, was the named Plan Fiduciary. AdminOne was the Third Party Administrator.

Hale-Halsell's largest customer was United Supermarkets ("United"). United was Hale-Halsell's customer for approximately thirty-one (31) years, and United's weekly orders constituted approximately 40% of Hale-Halsell's business. Dkt. # 65, Ex. 3, Hawk  Deposition at 103.  Hale-Halsell owned 50% of United's stock since the 1970s. By the end of 2003, four (4) of the ten (10) individuals on United's Board of Directors were employees of Hale-Halsell. Id. at 63.

In October 2002, November 2002, October 2003, and November 2003, Hale-Halsell did not fill completely United's orders for merchandise. Specifically, the week of December 2, 2002, United experienced 6% "outs"[4] due to Hale-Halsell's incomplete deliveries.  Dkt. # 74, Ex. 10, Kirby Deposition at 70-71.  During the week of December 28, 2003, the outs rose to 6.3%.  Id.  On November 9, 2003, Hale-Halsell's outs were 6.2%, and they increased to 12.9% the following week. Id.  By the end of November 2003, Hale-Halsell's outs were approximately 18.9%. Id.  Even with outs as high as 18%, James Kirby ("Kirby"), the Vice President and Treasurer of United, testified that United did not consider terminating Hale-Halsell as its primary supplier:

> Q [Attorney Hickman]: I take it as we continue on into the 12.9 percent or 18.9 percent at the end of November, that still wasn't enough out percentage  that it caused you to decide at that time, we need to quit using [Hale-Halsell] as our supplier?
> A [Kirby]: Not that – no.  I mean it was getting tough, but we weren't sure what was going to happen.

---

[4]    "Outs" refer to the failure to fill orders.  Thus, a 6% out means that Hale-Halsell failed to deliver 6% of United's order.  A 50% out means that Hale-Halsell failed to deliver 50% of United's order.

Id.  As of January 7, 2004, United noted that Hale-Halsell's outs were an "all time high at 53.8%." Dkt. # 74, Ex. 9, Black email.  As of January 2004, United had reduced its orders from Hale-Halsell by half.  Thus, as a United employee noted, "our orders are down ½ and the outs are ½ of that."  Id.

United and Hale-Halsell managers had numerous communications regarding this problem. In late 2003, Hale-Halsell informed United that it was in the process of obtaining a loan from LaSalle Business Credit, LLC ("LaSalle").  Dkt. # 65, Ex. 3, Kirby Deposition at 19-20.  Hale-Halsell told United that this additional funding would aid it in filling United's orders.  Id.  On December 5, 2003, a United employee sent an email to Jay Snell ("Snell"), the Chief Executive Officer of United, stating: "Rob Hawk called and apologized, said they are working on a loan and things will get better in a couple of weeks. They will do whatever they can to work with us." Dkt. # 74, Ex. 1.  Despite its disappointment in Hale-Halsell's services, United retained Hale-Halsell as a supplier through 2002 and 2003.  On December 16, 2003, United placed an order with another company to cover the goods not delivered as a result of Hale-Halsell's outs. Dkt. # 65, Ex. 3, Kirby Deposition at 29.  In United's 2003 Board meeting, the issue of Hale-Halsell's inability to complete orders was not discussed.  Id.

Hale-Halsell commenced its loan application process with LaSalle in early 2003. Dkt. # 65, Ex. 11. On December 8, 2003, LaSalle proposed a loan to Hale-Halsell in an amount up to $15,000,000.  Hale-Halsell gave LaSalle a deposit check in the amount of $30,000 on December 10, 2003 as acceptance of LaSalle's proposal. Dkt. # 65, Ex. 13. Hale-Halsell continued to send financial records to LaSalle throughout 2003. LaSalle believed that Hale-Halsell had sufficient assets to secure the loan. Dkt. # 65, Ex 4.

As early as January 9, 2003, Hale-Halsell consulted with its lawyers about the possibility of filing for bankruptcy. On that date, Hale-Halsell's attorneys, Conner & Winters, sent Hawk an email about "getting Conner & Winters a $100,000 retainer more than 90 days before any possible bankruptcy filing date." Dkt. # 74, Ex. 6.  The email discussed "planning for the possibility, however remote, of bankruptcy filings." Id.  It also outlined "other tasks…helpful to the turnaround" of Hale-Halsell. Id.

On January 8, 2004, Snell sent a letter to Hawk expressing his concern about Hale-Halsell's continued inability to complete United's orders.  Snell recognized United and Hale-Halsell's "long-standing supply relationship" that "has produced a lot of mutual benefit" for both companies.  Dkt. # 65, Ex. 5. He noted that Hale-Halsell's recent outs "are putting United in a horrible position," but "[d]espite these 'outs,' United has continued to place orders with Hale-Halsell and has continued to hope that Hale-Halsell closes the promised loan to ease its financial difficulties."  Id.  Snell further stated, "I'm not saying that United wants to discontinue ordering from Hale-Halsell or that United is terminating its supply relationship with Hale-Halsell. It's just that United has got to have merchandise on the shelf." Id.  On January 9, 2004, Hawk sent a letter to Snell stating that Hale-Halsell was expecting to get its final approval for the LaSalle loan sometime that week. Dkt. # 65, Ex. 6. The letter stated, "I value our relationship and apologize for the difficulties Hale-Halsell has had, but we feel we have now turned the corner." Id. On January 15, 2004, however, Snell sent Hawk a letter informing him that United would stop using Hale-Halsell as its primary supplier. Dkt. # 65, Ex. 7. According to Kirby, if United had started getting regular merchandise orders from Hale-Halsell by January, then it would have retained Hale-Halsell as its primary supplier. Dkt. # 74, Ex. 10.

On January 20, 2004, Hale-Halsell met with F&M to inform F&M of United's decision to terminate Hale-Halsell as its primary supplier. Dkt. # 65, Ex. 8, Owens Deposition at 11-12. After conferring with its financial consultant, Hale-Halsell determined that it could no longer continue operating its business. Id.  On the morning of January 21, 2004, Hale-Halsell held a meeting with its office personnel and warehouse employees to inform them that it would undergo layoffs. Id. Later on January 21, 2004, a press report was released that stated that Hale-Halsell was laying off a majority of its work force. Dkt. # 74, Ex. 5.  It cited Hale-Halsell's loss of United as a customer and contained a statement by Hawk.  On January 22, 2004, Hawk sent a letter to a majority of the Hale-Halsell employees informing them that they were "permanently laid off." Dkt. # 74, Ex. 2. The letter stated:

> As you may be aware, Hale-Halsell Company has recently been faced with serious financial difficulties. It had been hoped that the Company would be able to get through this difficult time without having to eliminate any jobs. However, last week we unexpectedly lost the business of United Supermarkets of Oklahoma, which was one of our primary grocery customers. With the loss of such a major portion of our business, we cannot continue operating at our current staffing levels. As a result, Hale-Halsell is commencing a permanent reduction in force beginning on January 22, 2004.

Id.  By the end of January 2004, approximately 175 of the 325 Hale-Halsell employees were laid off. Dkt. # 65, Ex. 9. By March 18, 2004, Hale-Halsell had terminated all but approximately eight (8) employees. Id. Hale-Halsell filed for bankruptcy on March 22, 2004 in the Northern District of Oklahoma. Dkt. # 74, Ex. 9, Jobe Deposition at 15.

Prior to United's termination of Hale-Halsell as its primary supplier, in January 2004, F&M changed protocol regarding how Hale-Halsell could distribute funds within its F&M accounts. F&M required Hale-Halsell to submit a list of claims Hale-Halsell needed to pay ("draw requests"). F&M would then approve or disapprove these draw requests. F&M maintains that, at this time, Hale-

Halsell was in default of its F&M loans and that Hale-Halsell had insufficient funds to continue its operations. Dkt. # 53, Ex. 1, Affidavit of Medina.

In January and February 2004, some employees had funds withheld from their wages as Plan deductions that were not paid into the Claims Account at F&M.  On February 2, 2004, Russell Jobe, Hale-Halsell's accountant, sent an email to F&M stating, "It appears that some H-H family employee benefits accounts with F&M may have been frozen with other bank accounts . . . . We have been informed that checks are being returned as insufficient, while on line balances indicate positive bank balances . . . . Without release of these accounts, checks to medical providers will be returned and basically will curtail any health and dental benefits to our employees." Dkt. # 53, Ex. A. Eventually, the January 2004 funds were paid into the Claims Account. However, the February 2004 funds were not paid. It is disputed whether Hale-Halsell had unencumbered funds that it could have used to pay money into the Claims Account. See Dkt. # 74, Ex. 1, Medina Affidavit.

## II.

Defendant Hale-Halsell moves to strike the demand for a jury trial of plaintiffs' claims under the  ERISA and WARN Act on the grounds that these claims are equitable in nature and that a jury trial is not available for equitable claims.  Plaintiffs argue that a jury trial is appropriate under the WARN Act.  Additionally, plaintiffs contend that, since there are claims in this action in addition to the WARN Act and ERISA claims, the most efficient course is to try to the entire case before a jury.

ERISA does not specifically state whether a jury should be utilized to decide claims for relief under the Act.  Zimmerman v. Sloss Equip., Inc., 72 F.3d 822, 829 (10th Cir. 1995).  It is settled in this Circuit that ERISA allows for equitable relief only, and therefore plaintiffs do not have the right

to a jury trial on their ERISA claim.  <u>Adams v. Cyprus Amax Minerals Co.</u>, 149 F.3d 1156, 1158-59 (10th Cir. 1998) (holding that the relief granted by ERISA is equitable in nature and that plaintiffs are not entitled to a jury trial on ERISA claims); <u>see</u> <u>also</u> <u>Thomas v. Oregon Fruit Products Co.</u>, 228 F.3d 991, 996-97 (9th Cir. 2000) (collecting citations discussing equitable nature of relief in ERISA cases).  Indeed, in their response to Hale-Halsell's motion to strike plaintiffs' demand for a jury trial, plaintiffs do not even attempt to argue that they are entitled to a jury trial under their ERISA claim.

Although whether plaintiffs' WARN Act claim allows a jury trial is a more difficult inquiry, the Court need not address it because summary judgment is entered herein on the WARN Act claim. <u>See</u> IV(A), below.

While plaintiffs' ERISA claim is equitable in nature and, standing alone, would entitle Hale-Halsell to a non-jury trial, there are other claims at issue in this case.  Specifically, plaintiffs claim that they received paychecks from defendants that did not clear the bank, constituting violations of FLSA and state laws.  Dkt. # 7, ¶ 8, Amended Complaint.  Plaintiffs also claim that defendants failed to pay them other wages due in the form of accrued vacation time.  <u>Id.</u> ¶ 9.  Plaintiffs are entitled to a jury trial on these claims.  Thus, the Court denies Hale-Halsell's motion to strike plaintiffs' demand for jury trial.  At the same time, the Court notes that plaintiffs' ERISA claim is equitable in nature, and it will be adjudicated by the Court.

### III.

Defendant Hawk filed a motion for summary judgment on December 2, 2005 (Dkt. # 40) on the ground that he is not a "fiduciary" of the Plan and thus not liable for any of plaintiffs' claims. Alternatively, he argues that, even if he is a fiduciary, he did not breach any duty specified in the

Plan.  The Court determines that Hawk is not a fiduciary within the meaning of ERISA; thus, Hawk is entitled to summary judgment.

## A.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

**B.**

Under ERISA § 402(a), every employee benefit plan must provide for the appointment "one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). Here, the only named fiduciary of the Plan is Hale-Halsell, as Plan Administrator. Dkt # 42, Ex. A, Employee Benefit Plan. The fact that Hawk is not a named fiduciary does not end the analysis, however. ERISA designates as fiduciaries not only those persons expressly named by a plan, but also those persons who exercise control over the management and administration of the plan and the distribution of plan assets:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Once a person or entity is designated as an ERISA fiduciary, either named or functional, the fiduciary becomes subject to ERISA's statutory duties. These duties include, but are not limited to, "the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142-43 (1985).

In this case, Hawk did not render any investment advice under clause (ii) of the statute, nor did he exercise discretionary responsibility in the administration of the Plan under clause (iii). Thus whether Hawk is a fiduciary for ERISA purposes hinges on whether he exercised "any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Under this section of the statute, the Court must first identify the "assets" in question. Here, the "assets" are the

unpaid contributions to the employee-plaintiffs' Claims Account. Unpaid contributions to employee benefit accounts are unquestionably ERISA "assets." In re Luna, 406 F.3d 1192, 1198 (10th Cir. 2005) (holding that unpaid contributions are ERISA "assets" because, although the plan does not possess the unpaid contributions themselves, it does possess the contractual right to collect them).

The next and more difficult inquiry is whether Hawk exercised any authority or control respecting the unpaid contribution assets. It is important to note that, whereas plan management or administration confers fiduciary status only to the extent the party exercises *discretionary* authority or control, "discretion is conspicuously omitted from the fiduciary function of controlling plan assets." David P. Coldesina, D.D.S., P.C., Employee Profit Sharing Plan and Trust v. Estate of Simper, 407 F.3d 1126, 1132 (10th Cir. 2005). "[T]his distinction evidences Congress's intent to treat control over assets differently than control over management or administration." Id. Parties who control plan assets, therefore, are "*automatically* in a position of confidence by virtue of that control, and as such they are obligated to act accordingly." Id. (emphasis in original).

Even under the broad definition of "fiduciary" under 29 U.S.C. § 1002(21)(A)(i), an individual cannot be liable as an ERISA fiduciary solely by virtue of his position as a corporate officer or manager. Sasso v. Cervoni, 985 F.2d 49, 50 (2d Cir. 1993); In re Worldcom, Inc., 263 F. Supp.2d 745 (S.D.N.Y. 2003) (holding that all Worldcom officers and directors were not fiduciaries based on their corporate positions and their resulting power to appoint and remove plan fiduciaries). Thus, the fact that Hawk was the Chief Executive Officer of Hale-Halsell does not automatically mean that he is a fiduciary, even if he had the ultimate authority in the company.

A person assumes fiduciary status under 29 U.S.C. § 1002(21)(A)(i) only when he or she maintains some control over the plan assets. In In re Luna, the Court of Appeals for the Tenth

Circuit held that the two defendants, each of whom owned fifty percent of the company stock and both of whom were corporate officers, were not fiduciaries of the employee benefit plan because, even though they had a contractual duty to make contributions to the plan, they had no say over whether the contractual right to collect unpaid plan contributions was enforced or not. 406 F.3d at 1202. "[A]n employer cannot become an ERISA fiduciary merely because it breaches its contractual obligations to a fund." Id. at 1203. By contrast, in another Tenth Circuit case, the court reversed the district court's dismissal of the plaintiff's ERISA claims where the accountant-defendant maintained some authority and control over plan assets. Estate of Simper, 407 F.3d at 1131. There, the Tenth Circuit determined that the defendant's control over the plan funds was more than ministerial and thus sufficient to render fiduciary status. Id. at 1132.

Here, plaintiffs argue that Hawk exercised control over plan assets based on the fact that he had signature power on the employee benefit Claims Account. Since any authority or control over plan assets is sufficient to render fiduciary status, "acting as a signatory on behalf of a plan *can* indicate fiduciary control." Estate of Simpler, 407 F.3d at 1133 (emphasis added); see also IT Corp v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1421-22 (9th Cir. 1997) ("The right to write checks on plan funds is 'authority or control respecting management or disposition of assets.'"); LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997) (noting the significance of signatory authority in determining fiduciary status). However, as the Tenth Circuit has made clear, "performing this function [of signatory] in name only is likely insufficient [to render one an ERISA fiduciary]." Estate of Simpler, 407 F.3d at 1133. In Estate of Simpler, the court determined that the defendants were ERISA fiduciaries because they were "signatories in practice as well as in name." Id. The defendants received plan contribution funds from the plan, deposited the funds into their business

12

account, and then wrote checks on behalf of the plan for the amount of the contribution. Id. The defendants had "total control" of the plan's money while it was in their business accounts. Id. The situation here is substantially different. While Hawk was the signatory on the employee benefit Claims Account, he never had control over the funds themselves. Hawk did not actively exercise his signatory powers; he was a signatory in name only. Dkt. # 53, Ex. 3, Jobe Deposition (""Robert D. Hawk was the signer [for the Claims Account at F&M Bank] and [the signing] was done by laser printer at AdminOne's outsourcing on the check production."). Plaintiffs offer no evidence that Hawk exercised any sort of control over Plan assets; thus, he was not an ERISA fiduciary.

Whether a party is an ERISA fiduciary is a mixed question of fact and law. Estate of Simper, 407 F.3d at 1131; Hamilton v. Carell, 243 F.3d 992, 997 (6th Cir. 2001). However, in this case, there is no genuine issue of material fact concerning Hawk's status as a fiduciary. Thus, the Court determines, as a matter of law, that Hawk was not a fiduciary of the Plan for ERISA purposes. Therefore, Hawk is entitled to summary judgment.

## IV.

Hale-Halsell moves for partial summary judgment (Dkt. # 64) on plaintiff's WARN Act claim on the grounds that Hale-Halsell was not required to provide the 60 days' notice of its mass layoff on January 22, 2004 under the "unforeseeable business circumstances" exception, 29 U.S.C. § 2102(b)(2)(A), and the "faltering company" exception, 29 U.S.C. § 2102(b)(1), to the WARN Act. Hale-Halsell also moves for summary judgment on the plaintiffs' ERISA claim on the ground that it was not the party responsible for the plaintiffs' money that was deducted but never deposited in the Claims Account. The Court addresses Hale-Halsell's arguments pertaining to the WARN Act

in Section IV(A), below, and those pertaining to ERISA in Section IV(B), below.  The standard for summary judgment is articulated in Section III(A), above.

## A.

The WARN Act provides that an employer[5] "shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to its affected employees or representatives. 29 U.S.C. § 2102(a). The notice must specify the projected day of the closing or a fourteen (14) day period during which the closing is expected to occur.  20 C.F.R. § 639.7(b).  There are several exceptions to this general rule, however. Under each exception, the "employer bears the burden of proof that conditions for the exceptions have been met." 20 C.F.R. § 639.9. Even if an employer meets the burden of proof for one of the exceptions, it must give "as much notice as is practicable" to the employees. Id. In addition, at the time notice is actually given, the employer must provide a "brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3).

The first exception relevant here is known as the "unforeseeable business circumstances" exception. Under this exception, "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The employer has the burden of showing causation and unforeseeability. The Department of Labor has provided some commentary interpreting this exception. See 20 C.F.R. § 639.9. The regulations do not classify certain types of circumstances as per se unforeseeable. Rather,

---

[5]    The WARN Act applies only to employers who employ at least one hundred (100) full-time employees.

the regulations state that an important indicator of unforeseeability is that the circumstance is caused by "some sudden, dramatic, and unexpected action or condition outside the employer's control." Id., § 639.9(b)(1). For example, "a principal client's sudden and unexpected termination of a major contract with the employer" might be considered an unforeseeable business circumstance. Id.

In determining whether a particular event is unforeseeable, the Court will consider the facts and circumstances leading up to the layoff in light of the industry and business relationships involved. Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elisnore Shore Assoc., 173 F.3d 175, 186 (3rd Cir. 1999) ("What is a harbinger of disaster in one context may be an everyday occurrence in another."). The Court will look at the events at the time that they took place, rather than with the benefit of hindsight. Local Union 7107 v. Clinchfield Coal Co., 124 F.3d 639, 641 (4th Cir. 1997) ("When confronted with an assertion that the exception applies, a reviewing court must be careful to avoid analysis by hindsight; the trial of harbingers of an unforeseen event always looks brighter in retrospect."); Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996) ("We are mindful that an employer's commercially reasonable business judgment, rather than hindsight, dictates the scope of the unforeseeable business circumstances exception."). Also, according to the regulations, the test for determining whether the exception is met focuses on the employer's business judgment: "The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." Id., § 639.9(b)(2). Thus, the Court will examine the facts from the employer's (Hale-Halsell) perspective, recognizing that "even the most conscientious employers are not perfect, and [the WARN Act exceptions] thus allow needed flexibility for predictions about ultimate consequences that, though objectively reasonable, proved wrong." Loehrer, 98 F.3d at 1061.

15

Here, for the unforeseeable business circumstances exception to apply, Hale-Halsell has the burden of showing that, as of approximately November 22, 2003 (60 days before it announced its mass layoff), it was unforeseeable that Hale-Halsell would undergo a mass layoff within a fourteen day window of January 22, 2004. Hale-Halsell must also show that it provided notice of the mass layoff as soon as was practicable. Hale-Halsell argues that, as a matter of law, the loss of United as its primary customer was unforeseeable as of November 2003 and that this occurrence caused its closing.

It is undisputed that, as of November 22, 2003, Hale-Halsell was experiencing financial difficulties that affected its relationship with its largest customer, United.  Hale-Halsell was unable to fill completely its orders with United and its outages ranged between 6% and 18.9% in November 2003.  However, the fact that Hale-Halsell knew that its key customer was dissatisfied does not mean that the unforeseeable business circumstances exception does not apply.  See Elisnore Shore Assoc., 173 F.3d at 186 (exception applied in summary judgment context despite the fact that the company in question had severe cash shortages that stressed its business relationships); Loehrer, 98 F.3d at 1061-62 (exception applied even though the customer was dissatisfied with the company's performance because "despite these disquieting undercurrents . . . negotiations among the contracting parties were progressing favorably toward the end of the year").

Whether the unforeseeable business exception applies given the context of a dissatisfied customer depends on the customer's objective response to the problem and whether that response put the company on notice of looming closure.  Here, United had retained Hale-Halsell as its primary supplier throughout 2002 and 2003 even though Hale-Halsell had "outs" averaging approximately 6% in late 2002.  Thus, the mere fact that Hale-Halsell had outs in November 2003

does not mean that its relationship with United was in jeopardy at that time.  Also, even though the outs at the end of November 2003 were substantially higher than the outs in 2002 and early November 2003, United did nothing to suggest that it would terminate its relationship with Hale-Halsell.  On the contrary, according to United's Vice President, United had no intention of using a different primary supplier even when Hale-Halsell's outs reached 18.9%.  Dkt. # 74, Ex. 10, Kirby Deposition at 70-71. On numerous occasions, United and Hale-Halsell exchanged correspondence wherein United expressed its intention to retain Hale-Halsell as its primary supplier.  Specifically, and most importantly, Snell sent a letter to Hawk on January 8, 2004 stating United's intention to retain Hale-Halsell.  The letter reads: "I am not saying that United wants to discontinue ordering from Hale-Halsell or that United is terminating its supply relationship with Hale-Halsell, just that United has got to have merchandise on its shelves." Dkt. 65, Ex. 5.  Since United terminated Hale-Halsell as its primary supplier on January 15, 2004, it is clear that United made that decision sometime between January 8th and January 15th.  Thus, there is no question that, as of November 22, 2003, Hale-Halsell could not have anticipated losing United as a customer.

Hale-Halsell also had reason to believe that its financial position would improve and thereby solve the outage problem. In direct response to its inability to fill United's orders, Hale-Halsell sought a loan with LaSalle.  In late 2003, Hale-Halsell spent considerable time pursuing this loan, and LaSalle proposed a loan in the amount of $15,000,000. Loan managers at LaSalle were optimistic that the loan would be approved.  Hale-Halsell kept United apprised of its loan application process and assured United managers that securing a loan would resolve these outage problems. Even United employees and officers pointed to the pending loan as an indication that Hale-Halsell would soon be able to fill completely United's orders.  Dkt. # 74, Ex. 1.  Given that its future

financial position looked as if it would improve, Hale-Halsell did not reasonably foresee that United would stop using it as primary supplier on the eve of securing the loan.

Finally, Hale-Halsell had reason to believe that its relationship with United would continue given the long-history of business relations between the two companies. In applying the unforeseeable business circumstances exception, courts have recognized that a long-standing business relationship affects an employer's expectations. Local Union 7107, 124 F.3d at 643 ("a lengthy relationship builds a sense of security; the more storms weathered, the fewer feared"). United was Hale-Halsell's customer for over thirty years. United itself acknowledged its valuable, long-standing relationship with Hale-Halsell. In his January 8, 2004 letter to Hawk, Snell stated that United "values a great deal" its "long-standing supply relationship" with Hale-Halsell. Dkt. # 65, Ex. 5. He noted that, "Over the years, that relationship has produced a lot of mutual benefit for Hale-Halsell and United." Id. Moreover, Hale-Halsell and United were particularly close given that Hale-Halsell employees held positions on United's Board of Trustees. Given the context of United and Hale-Halsell's relationship, Hale-Halsell did not reasonably anticipate that relationship to end in January 2004, in spite of Hale-Halsell's sub-par performance in November 2003. Thus, the Court determines that there is no genuine issue of material fact that losing United as its largest customer was unforeseeable to Hale-Halsell in November 2003.

For the unforeseeable business exception to apply, the Court must also find that there is no genuine issue of material fact that losing United as its customer "caused" Hale-Halsell to layoff its employees, within the meaning of 29 U.S.C. § 2102(b)(2)(A). Plaintiffs submit that there is an issue as to whether the loss of United in fact rendered Hale-Halsell in a position where closing and mass layoffs were the only options. Also, plaintiffs point to factors, other than United's withdrawal of

18

business, that contributed to the mass layoff.  Specifically, plaintiffs argue that Hale-Halsell's relationship with its subsidiary, Git-N-Go, further threatened its financial position and jeopardized its ability to obtain the loan from LaSalle.  Regardless of the other circumstances that affected Hale-Halsell's financial position, the summary judgment record clearly shows that losing United as a customer was the cause of Hale-Halsell's decision to undergo mass layoffs.  According to Hawk, Hale-Halsell did not have the funds to continue operations even if Git-N-Go had paid Hale-Halsell for its debts on delivered products and even with a loan from LaSalle. Dkt. # 65, Ex. 2, Hawk Examination at 107.  Hawk maintains that these additional sources of funding "would have helped, sure, but to keep us solvent, no.  United quitting was the straw that broke the camel's back." Id. Other courts have held that losing a main customer "caused" the plant closing when losing that customer was the "last straw."  Jones v. Kayser-Roth Hosiery, Inc., 748 F. Supp. 1276, 1285 (E.D. Tenn. 1990) (holding that once the employer lost its largest customer, operating the plant was no longer economically feasible).  Hale-Halsell operated profitably, and even struggled doing so, with United as its main customer.  Once it lost that customer, Hale-Halsell was not required search for ways to continue operations so as to comply with the WARN Act's sixty-days' notice requirement. Jurcev v. Central Community Hospital, 7 F.3d 618, 624-25 (7th Cir. 1993) (the causation element of the unforeseeable business circumstances exception does not compel the employer to demonstrate that it had sufficient assets to remain open for sixty days after the employer loses its primary business customer).  Thus, United's termination of Hale-Halsell as its primary supplier "caused" the mass layoff within the meaning of the unforeseeable business circumstances exception.

The unforeseeable business circumstances exception also requires that the employer provide notice of a mass layoff as soon as practicable.  Plaintiffs argue that, even under the unforeseeable

business circumstances exception, Hale-Halsell should have given notice before January 22, 2004. Plaintiffs note that Hale-Halsell started to make arrangements for bankruptcy as early as January 6, 2004.  However, on January 6, 2004, Hale-Halsell merely engaged in discussions with its attorneys at Conner & Winters.  The email from Conner & Winters discussed "planning for the possibility, *however remote*, of bankruptcy filings."  Dkt. # 74, Ex. 6 (emphasis added).  The email also discussed strategies for Hale-Halsell's "turnaround."  Id.  Thus, this email supports Hale-Halsell's position that, as of early January 2004, it was attempting to resolve its financial problems in an effort to prevent closing and mass layoffs.  In arguing that the notice was not timely, plaintiffs also cite the fact that a press release was issued on January 21, 2004, a day before Hale-Halsell sent notification to its employees of their termination.  However, plaintiffs fail to acknowledge that on January 21, 2004, Hale-Halsell had meetings with officer personnel in the morning and warehouse employees in the afternoon to discuss the situation with United and Hale-Halsell decision to layoff a substantial portion of its workforce.  Dkt. # 65, Ex. 8, Owens Deposition at 26.  The fact that the formal letter with the brief statement about the reason for the layoffs was not sent until the next day does not render the notice insufficient under the WARN Act.

In sum, the Court finds that there is no genuine issue of material fact that United's termination of Hale-Halsell as its primary supplier was unforeseeable as of November 22, 2003 and that the termination caused the mass layoffs.  Cf. Local Union 7107, 124 F.3d at 643 (affirming the district court's grant of summary judgment on grounds that employer's loss of a major customer rendered the employer exempt from the WARN Act's notice requirement under the unforeseeable business circumstances exception); Jurcev, 7 F.3d at 620 (affirming the district court's grant of summary judgement under the unforeseeable business circumstances exception).  To hold otherwise,

the Court would undermine the purpose of the WARN Act.  The purpose of the Act is to provide

protection to workers and provide advance notice to workers to seek and obtain alternative jobs

given the prospective loss of employment.  <u>Snider v. Commercial Fin. Servs., Inc.</u>, 288 B.R. 890,

895 (Bankr. N.D. Okla. 2002).  The purpose is not to force an employer "to provide WARN notice

and close its doors when there is a possibility that the business may fail at some undetermined time

in the future."  <u>Watson v. Michigan Indus. Holdings, Inc.</u>, 311 F.3d 760, 765 (6th Cir. 2002).  As

the <u>Watson</u> court notes,

> Such a reading of the Act would force many employers to lay off their employees
> prematurely, harming precisely those individuals WARN attempts to protect.  A
> company that is struggling to survive financially may be able to continue on for years
> and it was not Congress's intent to force such a company to close its doors to comply
> with WARN's notice requirement.

<u>Id.</u>  In this case, Hale-Halsell reasonably believed that it would secure financing that would alleviate

its outage problems.  Based on its long-standing relationship with United and United's

correspondence as late as January 8, 2004 indicating United's intent to retain Hale-Halsell as

primary supplier,  Hale-Halsell could not have foreseen losing its largest customer as of November

22, 2003.  Hale-Halsell should not be expected to have filed preemptive notice of possible layoffs

with its employees as soon as it experienced financial troubles.  Within only days of learning that

United would use another primary supplier, Hale-Halsell determined that it could not remain open

and that it needed to layoff a majority of its workforce.  It provided the requisite notice and brief

statement of its reason for the layoff in the January 22, 2004 letter.  Thus, Hale-Halsell is entitled to summary judgment with respect to plaintiffs' WARN Act claim.[6]

## B.

Hale-Halsell also moves for partial summary judgment on plaintiffs' ERISA claim.  Hale-Halsell does not deny plaintiffs' claim that money was deducted but never deposited into the Claims Account.  Dkt. # 65, p. 21. Moreover, Hale-Halsell agrees that such a failure to deposit employee deductions into the Claims Account is a violation of ERISA.  Id.  However, Hale-Halsell argues that F&M, not itself, was responsible for this violation.  Hale-Halsell notes that F&M instituted a new policy in January 2004 whereby Hale-Halsell would make "draw requests" for all claims that needed to be paid.  F&M would then accept or reject in whole each draw request.  In this way, Hale-Halsell argues that F&M had control over Hale-Halsell's accounts, including the Claims Account, and that Hale-Halsell was barred from access to those accounts as a result of the new procedures.  Specifically, Hale-Halsell argues that it requested disbursement of funds to the Claims Account in February 2004, but F&M failed to make that disbursement.  Contrary to Hale-Halsell's assertions, there is a genuine issue of material fact as to whether Hale-Halsell had control over the Claims Account or was responsible for the failure to deposit employee deductions into that account.  F&M maintains that Hale-Halsell was in default of its loans to F&M and that there were insufficient funds to make the disbursements.  Moreover, there is a dispute as to whether Hale-Halsell had unencumbered funds with which it could pay amounts do in the Claims Account. Given that there

---

[6]     The Court recognizes that Hale-Halsell also moves for summary judgment on plaintiffs' WARN Act claim based on the "faltering company" exception. 29 U.S.C. § 2102(b)(2)(A). However, given that the Court grants Hale-Halsell's motion for summary judgment on the unforeseeable business circumstances exception, the Court need not reach this issue.

is a genuine issue of material fact as to whether Hale-Halsell was responsible for the failure to deposit money into the Claims Account, Hale-Halsell is not entitled to summary judgment on plaintiffs' ERISA claim.

**V.**

**IT IS THEREFORE ORDERED** that the Motion to Strike Plaintiffs' Demand for a Jury Trial (Dkt. # 63) filed by defendant Hale-Halsell Company is **denied**, Defendant's Motion for Summary Judgment (Dkt. # 40) filed by Robert D. Hawk is **granted**, and Defendant's Motion for Partial Summary Judgment (Dkt. # 64) filed by Hale-Halsell is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that defendant Sandra L. Hawk, personal representative of the Estate of Robert D. Hawk, deceased, is **terminated** as a party to this action.

**DATED** this 15th day of September, 2006.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT